**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRIDGEPORT HOSPITAL, et al.,

          *Plaintiffs*,

    v.

XAVIER BECERRA, in his official capacity
as Secretary of Health and Human
 Services,

          *Defendant*.

Civil Action No. 1:20-cv-01574 (CJN)

## MEMORANDUM OPINION

In 2019, the Department of Health and Human Services promulgated a regulation to address wage disparities among hospitals.  The regulation increases the amount hospitals in certain low-wage geographic areas receive in Medicare-reimbursement payments and offsets that increase by reducing reimbursement payments for all hospitals.  A group of hospitals filed this lawsuit challenging the regulation on several grounds.  *See generally Compl.*, ECF No. 1.  Those hospitals have since moved for summary judgment, *see* Pls.'s Mot. for Summ. J. ("Pls.'s Mot."), ECF No. 14, and the government has cross-moved for summary judgment,  *see* Def.'s Cross-Mot. for Summ. J. ("Def.'s Mot."), ECF No. 16.  For the reasons explained below, the Court grants the hospitals' motion in part, denies the government's cross-motion, and orders additional briefing on the issue of the appropriate remedy in light of this Memorandum Opinion.

### I.   Statutory & Regulatory Background

Title XVIII of the Social Security Act, commonly known as Medicare, establishes a federal healthcare program that covers the cost of medical services for the elderly and disabled.  *See* 42

U.S.C. § 1395 *et seq.*[1]  The federally funded Medicare program consists of four Parts.[2]  Part A, the Part relevant here, provides coverage and payment for, among other things, inpatient hospital services (*i.e.*, medical services that require admission to and discharge from a hospital).  *See generally* 42 U.S.C. § 1395ww(d); *see id.* § 1395c; *see also Am. Hosp. Ass'n v. Becerra*, 141 S. Ct. 2883 (2021) (considering a challenge to an HHS rule setting reimbursement rates for outpatient rather than inpatient services).

For the first two decades after its passage in 1965, Medicare reimbursed hospitals providing inpatient services based on the actual costs of the services, assuming they were within certain limits.  *See* 42 U.S.C. § 1395f(b)(1) (1988); *see Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) ("[P]roviders were reimbursed for the actual costs that they incurred, provided they fell within certain cost limits.").  That system provided "little incentive for hospitals to keep costs down," as higher costs often meant more reimbursement.  *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 974 (D.C. Cir. 1991).  In 1983, Congress changed the way Medicare reimbursed hospitals for inpatient services.  *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).  Instead of reimbursing hospitals for their actual costs, Congress created the Prospective Payment System, which reimburses hospitals based on predetermined fixed rates.  *Id.*; *see* 42 U.S.C. § 1395ww(d)(1)-(5).  The System sets a fixed amount that a hospital will receive for a particular service regardless of the actual costs the hospital incurs.  *See Toledo Hospital v. Xavier Becerra*, No. 19-CV-3820 (DLF), 2021 WL 4502052, at *1 (D.D.C. Sept. 30, 2021); *Dignity*

---

[1] The Centers for Medicare & Medicaid Services, a division of HHS, administers the program on behalf of HHS.  *See* 42 U.S.C. § 1395kk; *Adventist GlenOaks Hosp. v. Sebelius*, 663 F.3d 939, 941 n.2 (7th Cir. 2011).

[2] Part A covers inpatient hospital services and certain other institutional services; Part B covers physician services and certain outpatient services; Part C covers managed health care plans; and Part D provides prescription drug coverage. *See In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig.*, 123 F. Supp. 3d 584, 602 (D.N.J. 2015).

*Health v. Price*, 243 F. Supp. 3d 43, 45 (D.D.C. 2017) ("The system [] aims to avoid rewarding hospitals for operating at higher-than-average cost.").

In general terms, HHS relies on a base payment rate (known as the "standardized amount") tied to the national average cost of treating any given ailment. *See Centra Health, Inc. v. Shalala*, 102 F. Supp. 2d 654, 656 (W.D. Va. 2000); *Adventist GlenOaks Hosp.*, 663 F.3d at 941. The standardized amount consists of both a "non-labor-related" portion and a "labor-related" portion. *Centra Health, Inc.*, 102 F. Supp. 2d at 656. The non-labor-related portion involves the Medicare beneficiary's diagnosis among other considerations. *Id.* The labor-related portion consists of the proportion "of hospitals' costs which are attributable to wages and wage-related costs." 42 U.S.C. § 1395ww(d)(3)(E); *see also* 84 Fed. Reg. 42044, 42325 (Aug. 16, 2019).

Congress recognized that hospitals operate in geographic regions with different wage and labor costs. *See Dignity Health*, 243 F. Supp. 3d at 45; *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 275 (3d Cir. 2002) ("In order to account for wide variations in the cost of labor across the country, the amount of a hospital's payment under the PPS will vary depending on its location."). Congress thus required HHS to adjust a component of the labor-related portion of the standardized amount based on "the difference between hospitals' local wages and wage-related costs and the national average." 42 U.S.C. § 1395ww(E)(iii). To accomplish that mandate, HHS must calculate the so-called "wage index" to account for geographic differences in hospital wage levels. *See Toledo Hospital*, 2021 WL 4502052, at *1; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 206 (1988).

Specifically, 42 U.S.C. § 1395ww(d)(3)(E) provides:

[T]he Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary)

3

reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level. . . . [A]t least every 12 months . . . , the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States.

"The wage index must be updated each year 'on the basis of a survey' of the wage-related costs for hospitals in the United States." *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1158 (D.C. Cir. 2015). To satisfy that requirement, HHS has hospitals submit their wage-and-hour data on an annual basis. *See Robert Wood Johnson Univ. Hosp.*, 297 F.3d at 276 ("The wage index is updated each year based on hourly wage data collected from the hospitals."); *see also Adventist GlenOaks Hosp.*, 663 F.3d at 941 (noting that HHS "requires hospitals to report all paid hours, including paid lunch hours, overtime hours, paid holiday, vacation and sick leave hours, paid time-off hours, and hours associated with severance pay."). HHS then compiles those data and publishes a document "containing the cost data from all hospitals in a given area." *See Dignity Health*, 243 F. Supp. at 47. After revising the data to account for corrections, the agency publishes a wage index in the federal register. *Id.*; *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 86 (D.C. Cir. 2020). The agency then uses the data "to create the wage index for each geographic area," which involves comparing the "average hourly wage for hospitals in a given geographic area with the national average hourly wage." *Robert Wood Johnson Univ. Hosp.*, 297 F.3d at 276. That calculation "in turn determines the payment rate above or below the national average at which a hospital is reimbursed." *Id.*[3]

The wage data from each hospital therefore affect "the ultimate wage index for all hospitals, . . . and thus data errors or omissions by one hospital can" affect reimbursement "rates

---

[3] As a general matter, a wage index greater than 1.0 indicates that the hospital is in an area where the wages exceed the national average; whereas an index less than 1.0 indicates that the hospital is in an area where the wages fall below the national average. *See Dignity Health*, 243 F. Supp. at 46.

for other hospitals." *Baystate Franklin Med. Ctr.*, 950 F.3d at 87 (quotation omitted).  Beginning in 1991, Congress directed that the annual update to the wage index must not increase aggregate payments made to hospitals providing care to Medicare beneficiaries.  *See* 42 U.S.C. § 1395ww(d)(3)(E) ("Any adjustments or updates made under [42 U.S.C. § 1395ww(d)(3)(E)] for a fiscal year . . . shall be made in a manner that assures that the aggregate payments under [42 U.S.C. § 1395ww(d)] in the fiscal year are not greater or less than those that would have been made in the year without such adjustment.").  Put differently, adjustments to the wage index must produce a budget-neutral outcome.  *See Baystate Franklin Med. Ctr.*, 950 F.3d at 87 ("[C]hanges in the wage index must be budget neutral.").  As the Court of Appeals has put it, because HHS "must calculate a national average wage rate to develop the wage index, and because changes in the wage index must be budget neutral, . . . a change in any single wage index can affect the reimbursement rate of each hospital in the country."  *Id.* (quotation omitted).

When a hospital objects to a payment it has received, it may appeal the decision to the Provider Reimbursement Review Board, which Congress established to hear Medicare reimbursement disputes.  *See* 42 U.S.C. § 1395oo(a), (b); *id.* § 1395oo(a), § 1395oo(a)(1)(A)(ii), (2), (3).  A group of hospitals may bring an appeal before the Board if the matter in controversy involves a common question and the amount in controversy aggregates to at least $50,000.  *Id.* § 1395oo(b).  If the Board lacks authority to decide the question presented on appeal, the Board may grant expedited judicial review, which allows the hospitals to bring their challenge in federal court. *Id.* § 1395oo(f)(1) (noting that a federal district court may hear a challenge to a payment made under the Medicare statute when the contested issue before the Board "involves a question of law or regulations relevant to the matters in controversy[, and] the [Board] determines . . . that it is without authority to decide the question"); *see also* 42 C.F.R. § 405.1842.  The Board may not

review challenges "either to the constitutionality of a provision of a statute, or to the substantive or procedural validity of a regulation." *See Allina Health Servs. v. Price*, 863 F.3d 937, 940 (D.C. Cir. 2017) (Kavanaugh, J.) (quoting 42 C.F.R. § 405.1842(f)(1)).

An action brought in federal court under the expedited judicial review process "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code.  42 U.S.C. § 1395oo(f)(1).  That provision invokes the Administrative Procedure Act, which means among other things that a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A);  *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904 (D.C. Cir. 2010).

## II.    Factual Background

In 2018, HHS invited public comment on potential changes to how the agency calculates the wage index.  *See* 83 Fed. Reg. 20164 (May 7, 2018).  Concern in part over what the agency described as the "downward spiral" motivated the contemplated action.  84 Fed. Reg. 19158, 19394 (May 3, 2019).  The downward spiral refers to a scenario in which higher wage hospitals, by virtue of higher Medicare reimbursement payments, can afford to pay wages that keep them higher on the wage index; whereas lower wage hospitals, by virtue of lower Medicare payments, cannot afford to pay wages that allow them to ascend the index.  *Id.*  As the agency sees it, the spiral (though perhaps better described as a perpetual cycle) tends to keep higher wage hospitals in the higher end of the wage index and lower wage hospitals in the lower end.

In response to HHS's request for comment, several commentators echoed the agency's concern that how the agency calculates the wage index exacerbates disparities between and among hospitals in high- and low-wage areas.  *Id.*  In light of the comments, the agency agreed that the

6

downward spiral, together with a "lag between when hospitals increase the compensation and when those increases are reflected in the calculation of the wage index," does in fact exacerbate those disparities.  84 Fed. Reg. 19158, 19394–95 (May 3, 2019).

To mitigate these disparities, HHS first proposed "increasing wage index values for certain low wage index hospitals with low wage index values and decreasing the wage index values for certain hospitals with high wage index values to maintain budget neutrality." *Id.* at 19162.  In particular, the agency proposed inflating the wage index value of the hospitals in the lowest quartile by half the difference between (a) those hospitals' actual, wage index value and (b) the 25th percentile of all wage index values.  *Id.* at 19394–95.  To illustrate, assuming a hospital in a particular geographic area would have had a wage index value of 0.5, and assuming the 25th percentile wage index value is 0.8, under the proposal the agency would apply a wage index value of 0.65 to that hospital.  *See* 84 Fed. Reg. 42044, 42326 (Aug. 16, 2019).  Though the agency proposed decreasing the wage index values for hospitals in the top quartile to maintain budget neutrality, it also discussed an alternative adjustment, which would "apply[ ] a budget neutrality factor to the standardized amount rather than focusing the adjustment on the wage index of high wage index hospitals." *Id.* at 42338.  In other words, instead of opting to reduce the wage index value for the top quartile of hospitals, HHS's alternative was to adopt a payment reduction scheme that would apply across the board.

The agency's proposed rule—and what it called the "low wage index hospital policy"— received its share of pushback.  Commentators targeted what they termed the "redistribution policy."  They also targeted the ways in which HHS intended to maintain budget neutrality.  Notwithstanding these objections, HHS adopted, in the Final Rule challenged here, the proposal to adjust the wage index values of the hospitals in the bottom quartile.  In doing so, HHS

determined that "quartiles are a reasonable method of dividing the distribution of hospitals' wage index values" and that "identifying hospitals in the lowest quartile as low wage index hospitals . . . is a reasonable method of determining low wage index . . . hospitals for purposes of . . . addressing wage index disparities." *Id.* at 42326.  The agency also provided its view that the low wage index hospital policy "will increase the accuracy of the wage index," even though several commenters asserted that the policy "disregards accurately reported wage data." *Id.* at 42327.  And the agency based its authority to adopt the policy on the wage index statute, *see* U.S.C. § 1395ww(d)(3)(E), which the agency described as granting it "broad authority to adjust for area differences in hospital wage levels," *see* 84 Fed. Reg. 42044, 42329 (Aug. 16, 2019).

HHS did not, however, adopt the approach of decreasing the wage index values for only hospitals in the top quartile.  HHS opted instead to finalize the alternative proposal, *i.e.*, "a budget neutrality adjustment to the national standardized amount for all hospitals so that the increase in the wage index for low wage index hospitals . . . is implemented in a budget neutral manner." *See* 84 Fed. Reg. 42044, 42331 (Aug. 16, 2019).  Stated differently, HHS decreased the standardized amount that all hospitals receive for reimbursements to offset the additional amount hospitals in the bottom quartile receive.  The agency also stated its intention to continue with the low wage index hospital policy for at least four years.  *See id.* at 42048 ("[T]his policy will be effective for at least 4 years, beginning in [FFY] 2020, in order to allow employee compensation increases implemented by these hospitals sufficient time to be reflected in the wage index calculation.").

The Final Rule took effect on October 1, 2019.  *See id.* at 42044.  A number of hospitals located throughout the country grouped together to file an appeal with the Provider Reimbursement Review Board challenging the Rule and its effects on their 2020 reimbursement payments.  *See generally Compl.*  The hospitals also sought expedited judicial review, contending that the Board

8

lacked authority to decide the validity of the low wage index hospital policy. *See generally Compl.*, Ex 1, ECF No. 1-1 at 11. The Board agreed, granting the hospitals' request for expedited judicial review. *Id.*

The hospitals filed this lawsuit within sixty days, *see* 42 U.S.C. § 1395oo(f)(1), asserting seven causes of action, *see generally Compl.* Five of the seven are challenges under the Administrative Procedure Act to various aspects of the Rule. *Id.* The sixth cause of action requests Mandamus relief, while the seventh seeks a relief under the All Writs Act. *Id.* at 29–30.[4] The hospitals have since moved for summary judgment on their claims. *See* Pls.'s Mot., ECF No. 14. The government has cross-moved for summary judgment. *See* Def.'s Mot., ECF No. 16.

### III.   Jurisdiction

The Court starts with Article III standing. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them"). The Constitution of the United States limits the "judicial Power" to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2. To satisfy the case-or-controversy requirement, a plaintiff must show that it has "suffered an injury in fact," that is "fairly traceable to the challenged action of the defendant," and that "will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000) (quotation omitted). A plaintiff must satisfy each of the three imperatives with respect to each claim asserted. *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1125 (D.C. Cir. 1994) ("[A]

---

[4] In their reply to HHS's brief in opposition to the motion for summary judgment, the hospitals concede that they no longer intend to pursue their claims under both the Mandamus statute and the All Writs Act. *See* Pls.'s Reply in Supp. of Motion for Summ. J., ECF No. 21 at 50 n.12. The Court concludes that the hospitals have waived their claims for relief under both the Mandamus statute and the All Writs Act. *See Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) (noting that forfeiture entails "the failure to make the timely assertion of a right;" whereas "waiver is the intentional relinquishment or abandonment of a known right").

plaintiff's standing must be analyzed with reference to the particular claim made."); *see generally Canaday v. Anthem Companies, Inc.*, 9 F.4th 392, 396 (6th Cir. 2021).

The hospitals allege that, in order to adopt the low wage index hospital policy in a budget-neutral manner, HHS reduced the standardized amount to which they are otherwise entitled.  In other words, they contend that they have and will continue to receive lower payments because of the reduction to the standardized amount.  The government halfheartedly argues that this injury is not  traceable to the low wage index hospital policy.[5]  In its view, the hospitals that brought this lawsuit do not fall in the bottom quartile, which means that they lack standing to challenge that policy because they neither benefit from nor are harmed by it.  Instead, as the government sees it, the hospitals may challenge only the "separate budget neutrality policy."  *See* Def.'s Mot. at 27.

But the two policies are inextricably linked.  After all, HHS did not simply reduce the standardized amount, nor is there any suggestion that it would have done so independently.  Instead, the agency expressly adopted that reduction as "a budget neutrality adjustment to the national standardized amount for all hospitals so that the increase in the wage index for low wage index hospitals . . . is implemented in a budget neutral manner."  *See* 84 Fed. Reg. 42044, 42331 (Aug. 16, 2019).  Indeed, HHS appears to have believed that it was *required* to take some action to maintain budget neutrality because the low wage index hospital policy would increase payments to the hospitals in the bottom quartile.  And the Rule couples the low wage index hospital policy and the reduction to the standardized amount.  Indeed, the government all but conceded this point at oral argument when it admitted that a "linkage" exists between the two.

---

[5]  The government dedicates just a couple of pages of its opening brief to the standing argument.  *See* Def.'s Mot. And in its reply, the government "assumes *arguendo* that the Plaintiffs have standing."  *See* Def.'s Reply Br. in Supp. of Cross-Mot. for Summ. J., ECF No. 22 at 10 n.3.  The Court, of course, cannot assume it has jurisdiction.

None of the cases cited by the government suggests a different result.  In *White v. Bank of America*, for example, the court dismissed challenges to two bank policies because the plaintiff could not show that either policy deterred her from using the bank's services.  200 F. Supp. 3d 237, 243–44 (D.D.C. 2016).  That case says nothing about whether a court can decouple an agency's decision to reduce payments from the policy that caused the agency to adopt the reduction.  The same goes for *Anson General Hospital v. Azar*, 801 F. App'x 273 (5th Cir. 2020).  There, the court dismissed the case without any discussion of standing because the statute did not permit a challenge to another hospital's wage index data outside of the established wage data correction process.  *Id.* at 278.  Here, by contrast, the hospitals challenge a decision that affects the payments they receive, and they have brought their challenge in the manner required by the applicable statute and regulation.  *See* 42 U.S.C. § 1395oo(a), (b).

## IV.    The Summary Judgment Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "genuine" dispute about a material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)).  If the moving party has met its burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252.  In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.*  In a

case involving a challenge under the Administrative Procedure Act, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

## V.    Standard of Review

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).[6] Courts must also set aside agency action that is "arbitrary, capricious, an abuse of discretion, or" made "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Though courts presume the validity of agency action, *see Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000), and will not "substitute [their] judgment for that of the agency," *Sioux Valley Rural Television v. F.C.C.*, 349 F.3d 667, 679 (D.C. Cir. 2003), an agency's judgment and exercise of discretion must at the end of the day turn on reasoned decisionmaking, *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The party challenging an agency's action under the APA bears the burden of proof, *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015), meaning that the hospitals who have brought this lawsuit "bear the burden of showing that the wage indices violated the Medicare statute," *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 139 (D.D.C. 2016).

An agency's rule promulgated through the notice-and-comment rule-making process may in some instances receive *Chevron* deference. *See Toledo Hospital*, 2021 WL 4502052, at *6. Step one of the *Chevron* framework requires courts to explore whether "Congress has spoken

---

[6] As noted above, p. 6, Chapter 7 of Title 5 of the Medicare statute directs courts to analyze the hospitals' claims under the Administrative Procedure Act. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (noting that 42 U.S.C. § 1395oo(f)(1) incorporates the APA).

directly to the precise question at issue," and if so, courts "must give effect to [Congress's] unambiguously expressed intent." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").[7]  Put differently, the analysis ends at step one unless a court, "employing traditional tools of statutory construction, is left with an unresolved ambiguity." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (quotation omitted).  Assuming that the statute is sufficiently ambiguous, *Barnhart v. Walton*, 535 U.S. 212, 218 (2002), step two of the *Chevron* framework directs courts to consider whether the agency's interpretation "is based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843.  If so, courts will defer to the agency's interpretation.  *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696 (D.C. Cir. 2014).

In the specific context of Medicare, courts have recognized that broad deference may be warranted because Medicare constitutes "a complex and highly technical regulatory program." *Thomas Jefferson Univ.*, 512 U.S. at 512 (quotation omitted); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 419 (1993).

**VI.   The Statute Does Not Permit HHS to Promulgate the Low Wage Index Hospital Policy**

The hospitals contend that the Rule is inconsistent with the Medicare statute.  As the hospitals see it, the statute requires HHS to calculate the wage index based on data collected

---

[7] The *Chevron* framework also includes a Step zero that is inapplicable here. *See Cemex Inc. v. Dep't of the Interior*, No. 1:19-CV-01265 (CJN), 2021 WL 4191959, at *9 (D.D.C. Sept. 15, 2021); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1157 (10th Cir. 2016) (Gorsuch, J., concurring) (noting that "the Court added a 'step zero' to the Chevron sequence," which asks whether the agency's interpretation is of the sort that warrants deference in the first place).

through surveys, and the agency's decision to inflate the wage values of the hospitals in the bottom

quartile based on policy considerations runs contrary to the statutory text.  The Court agrees.

To return to the statute, 42 U.S.C. § 1395ww(d)(H) provides:

> [T]he Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level . . . . [A]t least every 12 months . . . , the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States.

HHS is thus required to adjust the "proportion" of the payment "attributable to wages and wage-related costs" for "area differences in hospital wage levels."  *Id.*  To account for such differences, HHS is required to establish a "factor" that "*reflect[s] the relative hospital wage level in the geographic area of the hospital compared to the national average*."  *Id.*  (emphasis added).  And the agency must "update the factor . . . on the basis of a survey conducted . . . of the wages and wage-related costs of subsection (d) hospitals in the United States."  *Id.*; *see Temple Univ. Hosp., Inc. v. Sec'y United States Dep't of Health & Hum. Servs.*, 2 F.4th 121, 125 (3d Cir. 2021).

The statutory language confirms several points relevant here.  First, and as the government conceded at oral argument, the use of the definite article "the" in the phrase "the national average hospital wage level" means that in any particular year there is a *single* national average hospital wage level; that single national level establishes the baseline.  *See* Minute Order, February 15, 2022.  Second, Congress's other "use[s] of the singular—'the proportion' and 'a factor'—indicate[ ] that the wage index must be uniformly determined and applied."  *Atrium Med. Ctr. v. U.S. of Health & Hum. Servs.*, 766 F.3d 560, 569 (6th Cir. 2014).  Third, the requirement that the agency rely on survey data implies (at the least) that the agency's wage index "must in fact

encompass only 'wages and wage-related costs' and must reasonably 'reflect the relative hospital wage level' in a given area." *Id.* Fourth, and perhaps most important, the statute's use of "the" in the phrase "*the* relative hospital wage level" indicates that Congress intended that there would be a single wage index—determined on the basis of data gleaned from a survey.

These points point in a single direction:  HHS is required to calculate "the" relative wage levels of hospitals in different geographic regions as compared to "the" national average hospital wage level. *See Centra Health, Inc.*, 102 F. Supp. 2d at 660 ("[T]he Act requires the [agency] to create an index that accurately represents the relative wage levels of hospitals in a given [area]."); *Atrium Med. Ctr. v. Sebelius*, 917 F. Supp. 2d 688, 695 (S.D. Ohio 2013)  ("The purpose of [the statutory command] is to ensure that the reimbursement rate is adjusted to reflect geographical variations in labor costs.").  Although the calculation need not be precisely accurate—after all, it is based on prior years' data, among other things—"the wage index must reflect the [agency's] best approximation of relative regional wage variations." *Methodist Hosp. of Sacramento*, 38 F.3d at 1230 (instructing the agency that it most not rely on erroneous data when calculating the wage index).  The low wage index hospital policy, however, is not a calculation of "the" relative wage levels of hospitals in different geographic regions as compared to "the" national average hospital wage level, and it is not "uniformly determined and applied." *Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 766 F.3d 560, 569 (6th Cir. 2014).  Instead, the low wage index policy *inflates* the wage index values of the hospitals in the lowest quartile.

The government responds by arguing that Congress conferred upon HHS the broad authority to establish wage index values and that the statute does not instruct the agency on how exactly the index must be calculated.  It's true that Congress did not expressly direct the agency regarding all of the inputs that would be included in the index, and courts have recognized that the

index need not meet a standard of "scientific exactitude." *Anna Jacques II*, 797 F.3d at 1165 (quotation omitted). But nothing in the statute suggests that Congress intended to give the agency the authority to adjust upward the wage index values of only those hospitals in the bottom quartile in a manner that does *not* "reflect[ ] the relative hospital wage level in the geographic area of [low wage index] hospital[s] compared to the national average hospital wage level," as required by 42 U.S.C. § 1395ww(d)(3)(E)(i). *See Baystate Franklin Med. Ctr. v. Azar*, 319 F. Supp. 3d 514, 518 (D.D.C. 2018), *aff'd*, 950 F.3d 84 (D.C. Cir. 2020) (noting that the agency uses "data" to "calculate[] the average hourly wage rate for hospitals in each geographic area.").

The government further argues that the phrase "reflecting the relative hospital wage level" is ambiguous, and that that ambiguity coupled with "the tremendous complexity" of the wage-index statute, *Methodist Hosp.*, 38 F.3d at 1229, should lead the Court to defer under *Chevron* to the agency's interpretation. The government is correct that "reflects" does not have precisely the same meaning as "equals," and that Congress could have used, but did not use, the phrase "*equals* the relative hospital wage level." But reflect is not nearly as ambiguous as the agency suggests. Instead, the most relevant meaning of reflect is to "reproduce" or to "show as a mirror"—which again indicates that Congress had in mind that there would be a single relative wage index. *See, e.g., Reflecting*, Webster's Third New International Dictionary 1908 (1976) ("[T]o give back or exhibit as an image, likeness, or outline: reproduce or show as a mirror does <the trees on the shore line were [reflecting] in the clear water>"); *Reflecting*, Webster's New Twentieth Century Dictionary 1517 (unabridged 2d ed., 1977) ("[T]o give back an image of; to mirror or reproduce."); *Reflect*, The American Heritage Dictionary 1093 (William Morris ed., 1976) ("To form an image of (an object); to mirror."); *see id.* ("the give back a likeness; become mirrored."). Increasing the

wage index for the lowest-wage hospitals does not "reflect" such hospitals' relative wage levels, but rather reflects something else entirely.

What's more, *Chevron* requires deferring to an agency's interpretation only if "the statute is silent or ambiguous with respect to the specific issue." *Chevron*, 467 U.S. at 843.  Judges should hesitate "to hand off the judicial power to an executive agency" when the statutory provisions at issue are "hardly so abstruse that we need an agency to interpret it for us." *Zurich Am. Ins. Grp. v. Duncan on behalf of Duncan*, 889 F.3d 293, 306 (6th Cir. 2018) (Kethledge, J., concurring in the judgment).  The word reflecting, based on the surrounding statutory context, including the requirement that the agency conduct a data-driven survey, does not leave room for HHS to adjust wage index values based on policy considerations. *See Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 174–75 (2d Cir. 2006) ("[The agency's] task is unambiguous: to calculate a factor that reflects geographic-area wage-level differences, and nothing else.  We reject [HHS's] contention that this provision, or any other in the Medicare Act, confers upon [it] the discretion to take into account all sorts of unrelated policy considerations, such as whether certain hospitals receive unwarranted advantages from other provisions of the Medicare reimbursement scheme.").

The government identifies another claimed ambiguity, contending that the low wage index hospital policy is permissible because the statute authorizes the agency to conduct the "survey" any way it sees fit.  The government is correct that Congress did not direct HHS regarding *how* it would conduct such surveys.  But Congress did require that updates to the wage index would be based on "a survey . . . of wages and wage-related costs of subsection (d) hospitals," and requiring a survey to gather cost information as inputs is wholly consistent with the idea that Congress intended that there would be a single index resulting from the agency's calculation based on the data.  Under the low wage index hospital policy, however, HHS would approve the data from the

wage survey, calculate the wage index as required by the statute, but then inflate the wage index values for the hospitals in the bottom quartile.

The agency's position also appears inconsistent with past practice.  Prior to adopting the low wage index hospital policy, the agency used data collected through a survey process to generate area wage index values.  *Anna Jacques Hosp.*, 797 F.3d at 1158.  Indeed, that statutory directive has led the agency to collect "annual cost reports from each hospital."  *Id.*  It has also led HHS to publish "a manual to guide hospitals through the reporting process."  *Id.*  The record does not reflect that HHS has ever previously inflated wage index values to take account for wage disparities in particular geographic areas.

The government contends that the intent behind the low wage index hospital policy was "to increase the accuracy of the wage index as a technical adjustment, and not to use the wage index as a policy tool to address non-wage issues related to rural hospitals, or the laudable goals of the overall financial health of hospitals in low wage areas or broader wage index reform." *See* 84 Fed. Reg. 42044, 42328 (Aug. 16, 2019).  Put differently, the government argues that increasing the wage index values of the hospitals in the lowest quartile has the effect of making the wage index more accurate because the adjusted wage index reflects the future wage index values of the hospitals in the bottom quartile (assuming of course that those hospitals adjust their wages with the increased reimbursements they receive).  But again, nothing in the statute suggests that Congress intended to grant the agency the authority to do something other than calculate the relative wage index values for different geographic areas.  Simply put, the low wage index hospital policy increases the wage index values of hospitals in low-cost labor markets without regard for their actual labor costs.[8]

---

[8] The government also contends that the Court should not step in the way of good policy.  The Court, of course, takes no position on whether increasing the wage index values of hospitals in the lowest quartile constitutes good policy.

One last note (although a lengthy one). The agency invokes the Medicare statute's "exceptions and adjustments" provision, 42 U.S.C. § 1395ww(d)(5)(I)(i), as a second source of authority for the low wage index hospital policy.[9] That provision provides that "[t]he [agency] shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as [it] deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i).[10] The Court of Appeals has described the provision as a "broad-spectrum grant of authority." *Adirondack Med. Ctr.*, 740 F.3d at 694. And Judge Moss has held, based on that provision, that the agency can make "an across-the-board 0.2 percent reduction to the standardized amount" based on that provision. *See Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 251 (D.D.C. 2015). But in

---

But the statute does not suggest that Congress intended to delegate that question to the agency. Indeed, Congress has itself made adjustments on at least two occasions. In 2003, Congress decreased the proportion of the reimbursement payment that gets adjusted for area differences in hospital wage levels for those hospitals with low wage index values. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, § 403, 117 Stat. 2066, 2265 (2003) (codified at 42 U.S.C. § 1395ww(d)(3)(E)(ii)). And in 2010, Congress instructed the agency to apply an inflated area wage index value for any hospital "located in a frontier State." *See* Patient Protection and Affordable Care Act, Pub. L. 111-148, § 10324, 124 Stat. 119, 959 (2010) (codified at 42 U.S.C. § 1395ww(d)(3)(E)(iii)(I)). Nothing stops Congress from adopting HHS's low wage index hospital policy.

[9] It is at least debatable whether HHS invoked its authority under § 1395ww(d)(5)(I)(i) to adopt the low wage index hospital policy. It seems more likely that HHS invoked the exceptions and adjustments provision for the purpose of achieving budget neutral implementation of the policy. *See* 84 Fed. Reg. 42044, 42331 (Aug. 16, 2019) ("[W]e invoke our authority at [42 U.S.C. § 1395ww(d)(5)(I)] in support of . . . a budget neutrality adjustment. Contrary to the suggestion of many commenters, we believe we could use our broad authority under that provision to promulgate such an adjustment to the extent it was determined that [§ (d)(3)(E)] was not available for that purpose [i.e., budget neutrality]."). HHS seeks to leverage a statement in the proposed rule in which it stated its belief that it had the "authority to implement [the] lowest quartile wage index proposal . . . under our exceptions and adjustments authority." 84 Fed. Reg. 19158, 19396 (May 3, 2019). The agency repeated that statement in the Final Rule. *See* 84 Fed. Reg. 42044, 42329 (Aug. 16, 2019) (The agency "stated in the proposed rule" that it had the "authority to implement [the] lowest quartile wage index proposal . . . under our exceptions and adjustments authority."). The fleeting statements in the Final Rule to what was discussed in the proposed rule most likely cannot be read as HHS basing its authority to promulgate the low wage index hospital policy on the exceptions and adjustments provision for two reasons. First off, discussion in the Final Rule about HHS's authority to promulgate the policy centers around § 1395ww(d)(3)(E)(i) (*i.e.*, the wage index statutory provision) rather than § 1395ww(d)(5)(I) (*i.e.*, the exceptions and adjustments provision). Second, the statements in the Final Rule fall below the section header dedicated to the decision to reduce the standardized amount for all hospitals rather than the decision to implement the low wage index hospital policy. *See* 84 Fed. Reg. 42044, 42329 (Aug. 16, 2019) ("b. Budget Neutrality for Providing an Opportunity for Low Wage Index Hospitals To Increase Employee Compensation"). But even assuming that HHS invoked the "exceptions and adjustments" provision as a basis for promulgating the low wage index hospital policy, reading that provision to permit the agency to adopt the policy is impermissible for the reasons stated above the line.

[10] All agree that payments made to hospitals according to wage index calculations fall "under this subsection."

reaching this conclusion, Judge Moss correctly noted that the "'exceptions and adjustments' provision does not give the [agency] carte blanche to override the rest of the Act." *Id.* at 259–60.

For several reasons, this clause does not authorize the Rule here. Specific provisions control over general ones. *See Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) ("This Court has understood the present canon ('the specific governs the general') as a warning against applying a general provision when doing so would undermine limitations created by a more specific provision."). This principle of statutory construction has particular force where, as here, Congress has enacted a complex scheme and has targeted specific problems with specific solutions. *See HCSC–Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam) (noting that this "basic principle of statutory construction" applies "particularly when the two [provisions] are interrelated and closely positioned, both in fact being parts of" the same statutory scheme). Reading the general "exceptions and adjustments" provision to allow the agency to adopt the low wage index hospital policy would gut the specific statutory provisions in place to calculate the wage index.

Courts also should be "reluctan[t] to treat statutory terms as surplusage." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (quotation omitted); *see Potter v. United States*, 155 U.S. 438, 446 (1894) (noting that the presence of statutory language "cannot be regarded as mere surplusage; it means something"). Reading the "exceptions and adjustments" provision to permit HHS to adopt the low wage index hospital policy would render meaningless the statutory framework in place to calculate wage index levels. The agency, in other words, could get around clear statutory directives by invoking the exceptions and adjustments provision as a basis of unbounded authority.[11]

---

[11] The "exceptions and adjustments" provision also authorizes adjustments only to "payment amounts," not to any wage index value established under § 1395ww(d)(3)(E)(i).

Because HHS must use wage data to calculate the relative hospital wage levels of particular geographic regions as compared to the national average, the agency exceeded its statutory authority when it altered the wage index for hospitals in the bottom quartile, such that those hospitals' wage index values were neither based on survey data nor rough approximations of the relative hospital wage levels.  *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015) ("[A]gencies do *not* have free rein to use inaccurate data.").  The hospitals have therefore bore "the burden of showing that the wage indices violated the Medicare statute." *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 139 (D.D.C. 2016) (quotation omitted).  As a result, the Rule must be set aside because it conflicts with Congress's statutory directive.  *See Sarasota Mem'l Hosp. v. Shalala*, 60 F.3d 1507, 1513 (11th Cir. 1995) (describing how the agency compromises the "uniformity of the wage index" when it picks and chooses what to include in the calculation).

## VII.   Additional Briefing on the Appropriate Remedy

Having concluded that the low wage index hospital policy must be set aside, the Court determines that additional briefing on the appropriate remedy is required.  It is not uncommon for district courts to request such briefing where, as here, the parties have focused principally on the merits.  *See, e.g., Cemex Inc. v. Dep't of the Interior*, No. 1:19-CV-01265 (CJN), 2021 WL 4191959, at *11 (D.D.C. Sept. 15, 2021); *Kunaknana v. U.S. Army Corps of Engineers*, 23 F. Supp. 3d 1063, 1098 (D. Alaska 2014) ("The Court" believes that the best path forward is for "the parties to provide additional briefing on what would be an appropriate remedy.").  Indeed, this is the approach the government requested if the Court were to invalidate the Rule.  *See* Def.'s Mem. in Supp. of Cross-Motion for Summ. J., ECF No. 17 at 54.

### VIII.    Conclusion

For the foregoing reasons, the hospitals' motion for summary judgment is **GRANTED** in part.   HHS's cross-motion for summary judgment is **DENIED**.   The Court orders additional briefing on the issue of the appropriate remedy in light of this Memorandum Opinion.   And an Order will be entered contemporaneously with this Memorandum Opinion.

It is so **ORDERED**.

DATE:  March 2, 2022

CARL J. NICHOLS
United States District Judge